BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

In re: Davol, Inc./C.R. Bard, Inc.                MDL Docket No. _____
Polypropylene Hernia Mesh Products
Liability Litigation

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR §1407 COORDINATION/CONSOLIDATION & TRANSFER
OF RELATED ACTIONS
TO THE SOUTHERN DISTRICT OF OHIO

INTRODUCTION

All Plaintiffs represented by undersigned counsel submit this brief in support of their motion for coordination or consolidation and transfer of related hernia mesh products liability actions against Defendants C.R. Bard, Inc. and Davol, Inc. *See* 28 U.S.C. § 1407; J.P.M.L. Rules of Proc. 6.1 and 6.2. For reasons in Plaintiffs' motion and as explained in detail below, the Panel should order the consolidation/coordination and transfer of the above-referenced lawsuits, and the lawsuits listed in the Schedule of Actions, to the Southern District of Ohio (Eastern Division), in Columbus, Ohio. The Western District of Missouri is an appropriate alternative transferee district for centralized pretrial proceedings.

FACTS

A.    **Bard Polypropylene Hernia Mesh Products**

Defendant C.R. Bard, Inc. is a developer, manufacturer, marketer, and seller of polypropylene hernia mesh devices ("hernia mesh," "hernia mesh products," or "hernia mesh devices") throughout the U.S. and worldwide. Its subsidiary, Defendant Davol, Inc., has been, and

continues to be, involved with the production and sale of many of those polypropylene hernia mesh devices (Defendants C.R. Bard, Inc. and Davol, Inc. are collectively referred to as "Defendants").[1]

The named Plaintiffs, like many other plaintiffs nationwide, have brought a products liability action against Defendants—alleging that the polypropylene hernia mesh devices that they received are defective and, as a result of receiving a defective product, they have had to undergo further medical treatment to repair complications caused by the products.

A hernia occurs when an internal organ such as the bowel protrudes through the muscle wall of the abdomen and/or groin due to a weakness in the muscle and/or connecting tissue. The hernia mesh products at issue are designed to serve as a permanent synthetic implantable polypropylene reinforcement device that resembles a "sheet," a "patch," or a "plug" of this synthetic material. Per year, approximately 700,000 hernia repairs are performed in the United States[2] using an open or laparoscopic technique. Defendant C.R. Bard considers itself the "market leader" in comprehensive soft tissue reconstruction and delivers a "growing line of mesh prosthetics."[3]

The lawsuits filed against Defendants all share one common denominator: the products at issue are all made of synthetic polypropylene. A secondary trait shared by many of the products

---

[1] On April 23, 2017, Becton Dickinson announced that it had structured a deal to acquire C. R. Bard, Inc. This deal included the acquisition of all subsidiaries, including Davol, Inc. The acquisition was announced as complete on December 29, 2017. Two cases listed on the Schedule of Actions also name Becton Dickinson as a Defendant. Accordingly, any reference to "Defendants" in Plaintiffs' Motion and Brief in Support includes Becton Dickinson.
[2] Dabbas N., *et al*., *Frequency of abdominal wall hernias: is classical teaching out of date?* JRSM Short Rep., 2011 Jan; 2(1):5.
[3] C.R. Bard's Hernia Repair and Fixation Website, available at: https://www.crbard.com/Davol/en-US/Products/Hernia-Repair-Fixation. Last accessed on April 10, 2018.

in these cases is a design modification intended to separate the polypropylene base material from the patient's internal organs.[4]

Plaintiffs assert that Defendants' products were defective and that the implantations of the defective products caused them severe physical injuries. Plaintiffs' pleadings allege that after implantation, the defective design and/or manufacture of Defendants' hernia mesh has caused, and continues to cause, unreasonable risks of severe adverse reactions. Specifically, Plaintiffs' complaints allege that Defendants' hernia mesh often results in post-implantation adhesions and damage to nerves, viscera, and other organs; severe inflammatory and allergic responses and foreign body rejection; migration of the mesh; and infections, whether immediate or delayed-onset. Moreover, in promoting and selling their products, Defendants either concealed or failed to adequately warn consumers and physicians of those many hernia mesh-related risks. *See* Schedule

---

[4] Some of Defendants' polypropylene hernia mesh products contain a biodegradable hydrogel layer known as Sepra®, which are, in most cases, denoted by the presence of "ST" within the product name. Another subset of Defendants' polypropylene hernia mesh products contains a layer of plastic known as expanded polytetrafluoroethylene (ePTFE). The Plaintiffs in the *Bourlokas v. Davol, Inc., et al.* (2:2018-cv-00615); *Whitehouse* v *Davol, Inc., et al.* (3:2018-cv-00020); *Stipelcovich v. C.R. Bard, Inc., et al.* (2:2017-cv-09656); *Lyon v. C.R. Bard, Inc., et al.* (4:2018-cv-00039); *Eli v. C.R. Bard, Inc., et al.* (4:2018-cv-00116); *Schapeler v. Davol, Inc., et al.* (4:2018-cv-00169); *Chrissan v. C.R. Bard, Inc., et al.* (4:2018-cv-00171); *Lee v. C.R. Bard, Inc., et al.* (6:2018-cv-03075); *Parker v. Davol, Inc., et al.* (3:2017-cv-00768); *Ogle v. C.R. Bard, Inc., et al.* (2:2018-cv-00819); *Gallow v. C.R. Bard, Inc., et al.* (2:2018-cv-02533); *Volpe v. C.R. Bard, Inc., et al.* (2:2018-cv-02602); *Zemko v. C.R. Bard, Inc., et al..* (2:2018-cv-02742); *Newland v. C.R. Bard, Inc., et al.* (2:2018-cv-02915); *Nance v. C.R. Bard, Inc., et al.* (1:2018-cv-00003); *Lane v. Davol, Inc., et al.* (2:2018-cv-00164); *Wroten v. C.R. Bard, Inc., et al.* (2:2017-cv-04546); *Abshire v. Davol, Inc., et al.* (2:18-cv-00268), *Silber v. Davol, Inc., et al.* (1:18-at-00257), and *Williams v. Davol, Inc., et al.* (1:18-cv-00151) have all brought claims arising from polypropylene meshes with "ST" coatings. Plaintiffs in the (PC) *Greschner v. California Department of Corrections & Rehabilitation, et al* (2:2015-cv-01663); *Dawson-Webb v. Davol, Inc., et al.* (2017-cv-62012); *Barbaree v. Davol, Inc., et al.* (9:2018-cv-80243); *McGinnis v. C.R. Bard, Inc., et al.* (1:2016-cv-01255); *Coleman v. Davol, Inc., et al.* (1:2018-cv-01706); *Moore v. C.R. Bard, Inc., et al.* (0:2017-cv-00132); *Coussas v. Davol, Inc., et al.* (2:2018-cv-04015); *Powell v. Davol, Inc., et al.* (4:2018-cv-00156); *Dove v. Davol, Inc., et al.* (3:2018-cv-00003); *Reed v. Davol, Inc., et al.* (1:2016-cv-01194); *Furleiter v. Davol Inc., et al.* (2:2018-cv-01229); *Currey v. Davol, Inc., et al.* (2:2018-cv-00222); *Gordon v. C.R. Bard, Inc., et al.* (2:2017-cv-04553); *Brugger et al v. C.R. Bard, Inc., et al.* (3:2017-cv-00228); *Brown v. C.R. Bard, Inc., et al.* (2:2018-cv-00580); *Adams v. C.R. Bard, Inc., et al.* (2:2018-cv-00582); *Terrell v. C.R. Bard, Inc., et al.* (3:2017-cv-01575); and *Becerra v. C.R. Bard, Inc., et al.* (1:2018-cv-000230) have all brought claims arising from polypropylene meshes with an ePTFE layer.

of Actions and corresponding complaints, attached as Exhibits 1-55 for a complete list of the factual allegations alleged in the complaints filed throughout the country.

For reasons below, centralized pretrial proceedings are warranted in Plaintiffs' requested transferee district.

**B.      The Location and Status of Hernia Mesh Lawsuits Pending Against Defendants**

The related cases for which Plaintiffs seek centralization all involve at least one of Defendants' polypropylene hernia mesh products and consequent injuries. These cases have been filed in various U.S. District Courts all over the country. Of the currently filed cases, five involve a "multi-implant" case in which a Plaintiff received more than one of Defendants' polypropylene hernia mesh products during the same or subsequent surgery.[5] The attached Schedule of Actions lists all known related actions, with corresponding complaints attached as Exhibits 1-55. No activity in any of these cases is so significant that transfer would impede progression of the cases.[6]

## ARGUMENT

**A.      Centralization of Related Actions Against Defendants Is Statutorily Warranted**

28 U.S.C. § 1407 authorizes the Panel to centralize litigation against Defendants. It provides the following in part:

> (a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon

---

[5] *See Greschner v. California Department of Corrections & Rehabilitation, et al.* (2:2015-cv-01663); *Lee v. C.R. Bard, Inc., et al.* (6:2018-cv-03075); *Zemko v. C.R. Bard, Inc., et al..* (2:2018-cv-02742); *Lane v. Davol, Inc., et al.* (2:2018-cv-00164); and *Brown v. C.R. Bard, Inc., et al.* (2:2018-cv-00580).
[6] Plaintiffs' Motion, Brief in Support, and accompanying Schedule of Actions specifically exclude all cases in which the product at issue is the Composix Kugel Hernia Patch that was the subject of a recall and was the focus of *In re: Kugel Mesh Hernia Patch Products Liability Litigation*, MDL 1842, which the Panel closed on September 8, 2017.

4

its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

The actions in the accompanying Schedule, together with copies of Plaintiffs' complaints against Defendants to date, establish that they meet the statutory requisites for the Panel's determination that centralization is warranted. In summary, the cases should be transferred because: (1) The civil actions against Defendants are pending in different federal judicial districts throughout the U.S.; (2) the various actions share common factual questions; and (3) transfer/consolidation will be convenient overall, will promote litigation efficiencies, and will conserve judicial, party, and counsel resources. Plaintiffs address the separate statutory factors in detail below.

**B.     The Related Actions Against Defendants Share Common Questions of Fact**

Pretrial centralization of products liability actions against Defendants would be pointless if no common factual questions were presented. But that is far from the case here; the threshold condition is met because common questions of fact abound throughout the actions.

Below is just a sampling of the fact questions Plaintiffs' actions against Defendants share:

- whether there are design and/or manufacturing defects inherent in the polypropylene used in the hernia mesh products;
- the nature and extent of common design defects such as the shape of the hernia mesh products and how those defects impact the frequency and type of adverse events;
- for those products with the "ST" coating, whether there are design and/or manufacturing defects inherent in the coating;
- whether certain components of the hernia mesh products contain manufacturing and/or design defects that can cause severe injury;
- whether Defendants complied with regulations related to the commercialization of medical devices;

- whether Defendants knew, or should have known, about the above-referenced defects and their propensity for injury;

- whether Defendants failed to warn, or inadequately warned or instructed consumers and physicians of those defects; or whether they concealed negative product information from consumers and physicians;

- whether the defective hernia mesh and/or Defendants' business practices and conduct concerning the hernia mesh, resulted in liability;

- whether Plaintiffs and others suffered injuries from implanted hernia mesh products and actions or inaction concerning the products.

The Panel typically orders transfer and centralization when common factual questions, similar to those here, appear in products liability litigation (hernia mesh and other types). *See, e.g., In re: Farxiga (Dapagliflozin) Prods. Liab. Litig.*, 273 F. Supp. 3d 1380, 1382 (J.P.M.L. 2017) ("The actions … implicate numerous common issues concerning the development, manufacture, testing, regulatory history, promotion, and labeling of the drugs."); *In re: Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig.*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017) ("All of the actions share common factual questions arising out of allegations that defects in . . . Physiomesh . . . can lead to complications when implanted in patients . . . ."; *In re: Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.*, 223 F. Supp. 3d 1355, 1356 (J.P.M.L. 2016) (listing common factual questions like those Plaintiffs note above in litigation involving different hernia mesh devices manufactured by the same Defendant).

Nor do individual-specific facts in related actions deter centralization. To the contrary, the Panel typically orders the transfer of such cases too, holding the following: "[T]ransfer does not require a complete identity of parties or factual issues when, as here, the actions arise from a common factual core." *See In re: Eliquis (Apixaban) Prods. Liab. Litig.*, 2017 WL 6569794, at *2 (J.P.M.L. May 30, 2017) (citation omitted); *see also In re: Roundup Prods. Liab. Litig.*, 214 F. Supp. 1346, 1347 (J.P.M.L. 2016) ("[D]ifferences are not an impediment to centralization when

6

common questions of fact are multiple and complex."); *In re: Tylenol (Acetaminophen) Marketing, Sales Practices & Prods. Liab. Litig.,* 936 F. Supp. 2d 1379 (J.P.M.L. 2013) (citation and internal quotation marks omitted) ("As we have previously observed. . .almost all injury litigation involves questions of causation that are case- and plaintiff-specific.").

The facts in the related actions against Defendants present numerous common questions, many of them complex. Further, due to that factual and legal commonality, Defendants' defenses are unlikely to differ significantly from case to case. Therefore, centralization through transfer to a single judicial district is needed. The Panel should grant Plaintiffs' motion.

C. **Centralization and Transfer of the Related Actions Against Defendants Will Serve the Convenience of Parties and Witnesses and Promote Just and Efficient Litigation**

The MDL statute was enacted some 50 years ago to promote efficiency of litigation in which related actions are filed and pending in different judicial districts; and to make such litigation convenient for parties and witnesses. The transfer and centralization Plaintiffs seek adheres to those statutory goals.

1. **Efficiency of litigation**

At the outset, coordination/consolidation and transfer will "promote the just and efficient conduct" of the many related hernia mesh products liability actions against Defendants. As established above, the cases share numerous factual questions in common. Due to that commonality, without consolidation/coordination pretrial discovery will undoubtedly propound the same or similar interrogatories across the board, seek depositions of the same corporate witnesses, request production of the same or similar documents, and designate many of the same experts. Thus, pretrial motion practice will obviously be heavy, and virtually unmanageable without centralization. Further, despite common fact and legal questions, conflicting rulings on the issues are a real risk if judges in several different courts are involved.

But such duplication, redundancy, and conflict will be precluded through transfer and centralization. As the Panel recently put it in centralizing pretrial proceedings:

> Centralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* issues and other pretrial matters, and conserve the resources of the parties, their counsel, and the judiciary.

*See In re: Farxiga*, 273 F. Supp. 3d at 1382; *see also, e.g.*, *In re: National Prescription Opiate Litig.*, ___ F. Supp. 3d ___, 2017 WL 6031547, at *2 (J.P.M.L. Dec. 5, 2017) ("[A]llowing the various cases to proceed independently across myriad districts raises a significant risk of inconsistent rulings and inefficient pretrial proceedings."); *In re: Atrium Med. Corp.*, 223 F. Supp. 3d at 1356 ("Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary."); *In re: Air Crash over the Southern Indian Ocean, on Mar. 8, 2014*, 190 F. Supp. 3d 1358, 1359 (J.P.M.L. 2016) (same).

### 2. Convenience of parties and witnesses

Centralization and transfer to the Southern District of Ohio also satisfies § 1407's added requirement. Pretrial proceedings in a court in a single district will foster the convenience of witnesses and parties in the expanding number of related hernia mesh actions throughout many districts. To that end, the Panel generally orders centralization when it determines that the other statutory requisites are met. *See, e.g., In re: Eliquis (Apixaban) Prods. Liab. Litig.*, ___ F. Supp. 3d ___, 2017 WL 490702, at *2 (J.P.M.L. Feb. 7, 2017); *In re: 21st Century Oncology Customer Data Security Breach Litig.*, 214 F. Supp. 3d 1357, 1358 (J.P.M.L. 2016) ("[W]hile it might inconvenience some parties, transfer of a particular action often is necessary to further the expeditious resolution of the litigation taken as a whole."). Centralization is warranted here for the same reasons.

First, neither Defendants nor Plaintiffs will be forced to replicate various pretrial filings in courts across the country. Instead, both sides will be subject to a pretrial program designed by a single court overseeing the entire litigation, thus saving them both expense and inconvenience.

Next, the location of the Southern District of Ohio, Eastern Division, in Columbus, Ohio affords multiple benefits to Defendants and Plaintiffs. In the interest of brevity, Plaintiffs refer the Panel to the discussion below in Sec. D, concerning the merits of that location.

And last, as a side note, when discussing the convenience factor, the Panel has occasionally observed that corporate headquarters are found in a given potential transferee district. *See, e.g., In re: Equifax, Inc., Customer Data Security Breach Litig.*, ___ F. Supp. 3d ___, 2017 WL 6031680, at *2 (J.P.M.L. Dec. 6, 2017) ("Equifax is headquartered in [the Northern District of Georgia], and relevant documents and witnesses thus likely will be found there."). Defendant C.R. Bard is incorporated and based in New Jersey; and Davol, Inc. is incorporated in Delaware, with its principal place of business in Rhode Island. Nonetheless, as Plaintiffs establish in Sec. D below, the Southern District of Ohio is far more convenient than any of those three states.

The location of Defendants' corporate headquarters is not dispositive of the convenience factor. To the contrary, it plays a minor part in a convenience analysis—and one that is diminishing in significance. *See, e.g.*, *Bartolucci v. 1-800 Contacts, Inc.*, 245 F. Supp. 3d 38, 48 (D. D.C. 2017) (internal quotation marks and citations omitted) (analyzing access to proof under 28 U.S.C. § 1404(a): "While access to proof is still relevant in a motion to transfer inquiry, modern technology has made the location of documents … much less important to a determination of convenience than it once was."); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLC*, 240 F. Supp. 3d 848, 853 (N.D. Ill. 2016) ("location of the sources of proof. . .has become less important in recent years because documentary and digital evidence is readily transferable …").

9

In short, the above factors also support centralization and, more specifically, centralization to a geographically convenient location. For these reasons as well, the Panel should grant Plaintiffs' motion.

## D. The Southern District of Ohio, Columbus Division, Is the Most Appropriate Transferee District

As stated above, Defendants do business throughout the United States from coast to coast and market, distribute, promote, and sell their hernia mesh products in all states. Given those facts, the transfer of Defendants' polypropylene hernia mesh related cases to the U.S. District Court for the Southern District of Ohio (Eastern Division), is most appropriate due to its geographically centralized location and its ability to handle a large volume of cases. Moreover, Chief Judge Edmund Sargus, Jr. is an excellent candidate for a transferee judge due to his experience and proven ability to handle large, complex cases.

### 1. The Southern District of Ohio's Centralized Location is Geographically Ideal

When related actions are pending in various districts throughout the nation, the Panel holds the geographically central location of a potential transferee district a highly significant factor. *See, e.g.*, *In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968) ("[A]lthough air travel renders both [coasts of the United States – California and New York] readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation."); *In re: Epipen (Ephinephrine Injection USP) Marketing, Sales Practices & Antitrust Litig.*, 268 F. Supp. 3d 1356, 1359 (J.P.M.L. 2017) (transfer of nationwide litigation to "geographically central forum" of District of Kansas); *In re: Genentech Herceptin (trastuzumab) Marketing & Sales Practices Litig.*, 178 F. Supp. 2d 1374, 1376 (J.P.M.L. 2016) (transfer to Northern District of Oklahoma: "a geographically central forum for this nationwide litigation"); *In re: Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 2d 1378, 1381 (J.P.M.L.

2015) (transfer to District of Minnesota: a "geographically central and convenient forum for this nationwide litigation").

This Panel has found the Southern District of Ohio to be an appropriate forum in several MDL proceedings. *See, e.g., In re: American Honda Motor Co., Inc., CR–V Vibration Mktg. and Sales Practices Litig.*, MDL 2661, 140 F. Supp. 3d 1336, 1337 (J.P.M.L. 2015) ("We select the Southern District of Ohio as the transferee district for this litigation… [i]n addition, a majority of plaintiffs support selection of that district…"); *In re: E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.,* 939 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013) ("The Southern District of Ohio is both accessible and convenient for parties and witnesses.") *In re: Porsche Cars N. Am., Inc.,* 787 F. Supp. 2d 1349, 1349 (J.P.M.L. 2011) ("We have selected the Southern District of Ohio as the transferee district for this litigation, because this district is geographically centrally located for parties and witnesses in this nationwide litigation and has the capacity to manage this MDL."); *In re: Bill of Lading Transmission & Processing Sys. Patent Litig.*, 626 F. Supp. 2d 1341, 1342 (J.P.M.L 2009) ("The Southern District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation."); *In re Vision Serv. Plan Tax Litig.,* 484 F. Supp. 2d 1356, 1357 (J.P.M.L 2007) ("[C]entralization under Section 1407 in the Southern District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."); *In re: Foundry,* 342 F. Supp. 2d at 1347 ("[T]he Southern District of Ohio will serve the convenience of the parties and witnesses").

Since this litigation will likely involve a large number of cases spread across the country, geographical factors weigh heavily in support of transfer to the Southern District of Ohio. Furthermore, the city of Columbus is easily accessible. The John Glenn International Airport

(Columbus, OH) serves seven airlines that provide non-stop flights to over 40 destinations.[7] Once arriving at the John Glenn International Airport, the drive to the Joseph P. Kinneary U.S. Courthouse in Columbus is only 7.7 miles—a mere 12 to 15 minutes in a convenient shuttle, cab, or rideshare.[8]

### 2. The Southern District of Ohio has the Ability to Handle Large Case Loads and Hon. Edmund Sargus, Jr. Has the Skill, Experience, and Capacity to Supervise this MDL

The Southern District of Ohio has the capacity to handle this MDL. The District has six District Judges, six Senior Judges, and nine Magistrate Judges.[9] The Panel has determined that the district is equipped with the resources that a complex docket is likely to require. *In re: Nat'l Century Fin. Enters., Inc.,* 293 F. Supp. 2d 1375, 1377 (J.P.M.L. 2003). The Southern District of Ohio provides a well-staffed and top-notch clerks' office with plenty of experience in handling numerous cases, including complex cases, in an efficient manner. Moreover, in recent MDL's, the Southern District has proven itself capable of providing a user-friendly, easily accessible, and state-of-the-art webpage that provides useful information such as attorney contacts and court orders, thereby providing ease of access to information for litigants across the country.[10]

With regard to transferee judge selection, the Panel has determined that it is best to focus on the "transferee judge with the time and experience to steer this litigation on a prudent course and sitting in a district with the capacity to handle this litigation." *In re Motor Fuel Temperature Sales Practices Litig.*, 493 F. Supp. 2d 1365, 1367 (J.P.M.L. 2007). Furthermore, a particular

---

[7] https://flycolumbus.com/airline-info/non-stop-destinations. Last accessed: April 5, 2018.
[8] Data derived from Google Maps. Last accessed: April 6, 2018.
[9] http://www.ohsd.uscourts.gov/judges-biographical-sketch. Last accessed: April 5, 2018.
[10] http://www.ohsd.uscourts.gov/multidistrict-litigation-2433. Last accessed: April 5, 2018.

judge's willingness, ability, and motivation for handling complex litigation is an essential element in venue selection.[11]

Chief Judge Edmund Sargus, Jr. readily satisfies these criteria and is the best choice for transfer and consolidation of this matter. Chief Judge Sargus was appointed to the bench in 1996 and has received numerous awards and accolades for his devotion to law and public service.[12] He currently serves as Chief Judge for the Southern District of Ohio. He has previously been recognized by the Panel as an "experienced judge." *See In re: E.I. du Pont de Nemours & Company C-8 Personal injury Litig.*, 939 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013).

---

[11] In a 2008 Tulane Law Review article entitled *A View from the Panel: Part of the Solution*, 82 Tul. L. Rev. 2225, 2240, Judge John G. Heyburn, II emphasized the importance of the transferee judge and stated "[t]he willingness and motivation of a particular judge to handle an MDL docket are ultimately the true keys to whether centralization will benefit the parties and the judicial system." *Id.*

[12] Chief Judge Sargus has received several honors and awards including: Honorary Doctor of Humane Letters, Muskingum College, 2006; Ohio Crime Prevention, Executive Director's Award, 1995; Annual President's Award, Franklin County-Columbus Domestic Violence Shelter, 1998; Annual Public Service Award, Ohio State Univ. Criminal Justice Research Center, 1999; Peacemaker Award, Tri-County Domestic Violence Shelter, 2006. His bio may be found at: http://www.ohsd.uscourts.gov/BioSargus, Last accessed on April 6, 2018.

Chief Judge Sargus's noteworthy rulings include his rejection of the State of Ohio's contention that the Religious Land Use and Institutionalized Persons Act was unconstitutional. *See Gerhardt v. Lazaroff*, 221 F. Supp. 2d 827 (S.D. Oh. 2002), *rev'd*, 349 F.3d 257, *rev'd*, 544 U.S. 709 (2005). The Supreme Court ruled that the Act was constitutional and reversed the appellate court's reversal of Chief Judge Sargus' opinion. *Cutter v. Wilkinson,* 544 U.S. 709 (2005).

The Supreme Court also reversed the Sixth Circuit Court of Appeals' reversal of Chief Judge Sargus's decision in litigation interpreting the Federal Reserve Board's Regulation Z and the Truth in Lending Act (TILA). *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004).

As an esteemed jurist, Chief Judge Sargus was asked to sit by designation in the Sixth Circuit, and delivered the scholarly opinion in *Steele v. Ind. Dev. Bd. of Metropolitan Nashville*, 301 F.3d 401 (6th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

Other examples of Chief Judge Sargus's notable opinions include: *Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006 (S.D. Ohio 2008); *U.S. v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003); *Watchtower Bible & Tract Society of New York v. Stratton, Ohio*, 61 F. Supp. 2d 734 (S.D. Ohio 1999), *aff'd,* 240 F.3d 553 (6th Cir. 2001), *rev'd*, 536 U.S. 150 (2002).

Additionally, the Chief Judge position is well suited to handle complex cases such as this matter. The Chief Judge is afforded additional staff and can, if he chooses, take a reduced case load. The Desktop for Chief Judges of U.S. District Courts suggest one way a Judge could manage or reduce his caseload is by taking "responsibility for only particular types of cases or matters." Federal Judicial Center, *The Desktop for Chief Judges of U.S. District Courts* 45 (4th ed. 2014). The Chief Judge is also responsible for determining whether the district will consent to the transfer of a case by the U.S. Judicial Panel on Multidistrict Litigation. *See* 28 U.S.C. § 1407(b). Thus, Chief Judge Sargus is well positioned to ensure proper and efficient case management of a matter like the instant action. And, Chief Judge Sargus would have ample time and resources to commit to this matter.

Chief Judge Sargus has experience adjudicating large-scale cases involving numerous plaintiffs and a variety of complex claims. For example, in *United States, et al. v. Ohio Edison Co., et al.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003), Chief Judge Sargus was faced with issues of corporate liability under the Clean Air Act when several states sued Ohio Edison surrounding emissions from a power plant. Thereafter, he mediated the remedy phase of the case which resulted in settlement. Most recently, in *In re: E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig., MDL No. 2433*, Chief Judge Sargus successfully steered a docket consisting of thousands of claimants who suffered personal injuries caused by diseases linked to consuming water contaminated by the chemical C-8. For a period of approximately four years, he shepherded the litigation through discovery, dispositive motions, complex disputes, trials, and ultimately

settlement. MDL No. 2433 is now globally settled.[13] Therefore, Chief Judge Sargus's ability to manage another complex docket should be unfettered.

Moreover, Chief Judge Sargus appears to have some interest in complex multi-district litigation. In 2015, Chief Judge Sargus was a distinguished speaker at Duke Law's Second Multidistrict Litigation Institute Conference. At that conference, Chief Judge Sargus spoke on the following topics: (1) common benefit funds; and (2) resolution and settlement. This conference is invitation only, and attendees include some of the most distinguished practitioners, academics, and judges throughout the country.

Chief Judge Sargus is an excellent judicial candidate for this MDL.

### E. Alternatively, the Western District of Missouri Would be an Appropriate Transferee District

If the Panel does not find the Southern District of Ohio to be the appropriate transferee district, the Western District of Missouri would also be an excellent choice. The Panel has previously found the Western District of Missouri to be an appropriate choice as a transferee district for complex litigation because—much like the Southern District of Ohio—it is centrally geographically located. *See In re: Simply Orange Juice Marketing & Sales Practices Litig.*, 867 F. Supp. 2d 1344, 1345 (J.P.M.L. 2012) (transfer to Western District of Missouri because its Midwest location is geographically central, making it equally "accessible to the parties ranging from California to Florida."). Further, with a metropolitan area population of over 2,000,000 residents, Kansas City, Missouri is served by all major domestic airlines, thus making it a convenient and easy destination from cities across the United States. Nearly a half-century ago

---

[13] See *In re: E.I. du Pont de Nemours & Company C-8 Personal Injury Litig., MDL No. 2433,* No. 2:13-md-02433, Doc. No. 5086 ("The parties have informed the Court that they have reached a global resolution of all the cases that make up this MDL. The court VACATES all of the current scheduling orders.").

15

the Panel held for the very same reason that actions in "widely-separated states" should be transferred to a centrally located district such as the alternate Plaintiffs request:

> Because of Kansas City's geographically central location, it is easily accessible from all parts of the country and provides a more convenient forum to all parties … [than] either an East or West Coast location.

*See In re: Transit Co. Tire Antitrust Litig*., 350 F. Supp. 1165, 1166 (J.P.M.L. 1972).

Nothing has changed over the decades. A district court in the Western District of Missouri (Western Division) remains an appropriate transferee forum for a large, nationwide litigation.

Finally, the Western District of Missouri also has the capacity to handle this MDL. The District has six District Judges, six Senior Judges, and eight Magistrate Judges.[14] The Western District of Missouri is a well-managed District with favorable docket conditions, especially when considering the manageable number of pending civil cases per judge in the District.[15] Of the many suitable transferee judges in the Western District of Missouri, the Honorable Beth Phillips would be a particularly good choice. While Judge Phillips has not yet had the opportunity to preside over an MDL, she is willing and able to steer this large and complex litigation on a prudent course.

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully request that this Honorable Panel order that the "Related Actions" and all tag-along actions be consolidated and coordinated for pretrial proceedings before Chief Judge Edmund Sargus of the United States District Court for the Southern District Ohio or, in the alternative, Judge Beth Phillips of the United States District Court for the Western District of Missouri.

---

[14] http://www.mow.uscourts.gov/district/judges. Last accessed: April 7, 2018.
[15] *See Federal Judicial Caseload Statistics*, March 31, 2017, available at http://www.uscourts.gov/sites/default/files/data_tables/fjcs_c_0331.2017.pdf

16

Respectfully submitted,

By*:*  */s/ Kelsey L. Stokes*
Kelsey L. Stokes
kelsey_stokes@fleming-law.com
Texas Bar No. 24083912
George M. Fleming
george_fleming@fleming-law.com
Texas Bar No. 07123000
**FLEMING, NOLEN & JEZ, L.L.P.**
2800 Post Oak Blvd.  Suite 4000
Houston, Texas 77056-6109
Telephone (713) 621-7944
Fax (713) 621-9638

By:  /s/ *Troy A. Brenes*
Troy A. Brenes, Bar No. 249776
BRENES LAW GROUP, P.C.
27141 Aliso Creek Rd., Ste. 270
Aliso Viejo, CA 92656
(949) 397-9360 (Telephone)
(949) 607-4192
tbrenes@breneslawgroup.com

By:  /s/ Steven C. Babin, Jr.
Steven C. Babin, Jr.    (0093584)
CHAPIN LEGAL GROUP, LLC
580 South High Street, Suite 330
Columbus, Ohio 43215
Telephone:  614.221.9100
Facsimile:  614.221.9272
E-mail:  sbabin@chapinlegal.com
  lchapin@chapinlegal.com

17

By: /s/ Adam M. Evans
Adam M. Evans (MO # 60895)
C. Brett Vaughn (MO # 66974)
HOLLIS LAW FIRM, P.A.
5100 W. 95th St.
Prairie Village, KS 66207
(913) 385-5400
(913) 385-5402 (fax)
adam@hollislawfirm.com
brett@hollislawfirm.com

Counsel for Plaintiffs in the following actions: *Silber* 1:18-00257 (E.D. Ca.); *Broyles* 4:18-00513 (E.D. Mo.); *Coussas* 2:18-04015 (W.D. Mo.); *Lyon* 4:18-00039 (W.D. Mo.); *Heili* 4:18-00130 (W.D. Mo.); *Manuel* 4:18-00131 (W.D. Mo.); *Rowe* 6:18-03019 (W.D. Mo.); *Ogle* 2:18-00819 (D. N.J.); *Spencer* 2:18-01692 (D. N.J.); *Zemko* 2:18-02742 (D. N.J.); *Lane* 2:18-00164 (S.D. Oh.); *Currey* 2:18-00222 (S.D. Oh.); *Abshire* 2:18-00268 (S.D. Oh.); *Williams* 1:18-00151 (E.D. Tx.); *Wade* 4:18-01112 (S.D. Tx.)